Jason R.N. Monteleone
JOHNSON & MONTELEONE, L.L.P.
405 South Eighth Street, Suite 250
Boise, Idaho 83702
Voice: (208) 331-2100
Facsimile: (208) 947-2424
*jason@treasurevalleylawyers.com*
Idaho State Bar No. 5441

Wm. Breck Seiniger, Jr.
SEINIGER LAW OFFICES, P.A.
942 Myrtle Street
Boise, Idaho 83702
Voice: (208) 345-1000
Facsimile: (208) 345-4700
Idaho State Bar No.: 2387

Attorneys for Plaintiff and Relator

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| United States of America *ex rel.* Trudy Davis,<br><br>      Plaintiff<br><br>v.<br><br>Lincare, Inc., a Delaware Corporation, and John Does I through X whose true identities are presently unknown,<br><br>      Defendants | Case No. **01-175-S-EJL**<br><br>**PLAINTIFF/RELATOR'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

### INTRODUCTION AND STATEMENT OF FACTS

The instant action is an action which has been brought pursuant to the federal

False Claims Act ("FCA"), 31 U.S.C. §3729, *et seq.* and asserts both substantive claims

under the FCA as well as wrongful termination/employment retaliation claims under that

statute. The U.S. has chosen not to intervene in the case, and Relator, Trudy Davis ("Davis"), as aggressively and diligently prosecuted the claims against Defendant, Lincare, Inc. ("Lincare"). Lincare has now moved for summary judgment. As genuine issues of material fact exist in this case, the instant motion should be denied on all bases, and the matter tried to a jury.

Lincare, Inc. ("Lincare"), based in Clearwater, Florida, is a publicly-traded company engaged in the healthcare and durable medical equipment industry. Lincare employs almost 8,000 employees, operates over 750 centers from which it distributes supplemental oxygen, and generated in excess of $1,000,000,000.00 in gross revenues in 2004. Its primary source of revenues derives from the provision of durable medical equipment which provides supplemental oxygen to patients. Many of these supplemental oxygen patients have their medical bills and expenses covered or reimbursed by Medicare/Medicaid and/or the Veterans' Administration ("VA"). Without question, supplemental oxygen is the vast majority of Lincare's business.

Davis was a customer service representative for Lincare from October 7, 1999 until September 22, 2000, in the Boise center. In that capacity, Davis was the individual primarily responsible for assuring that the appropriate documentation was in place for the claims which Lincare submitted to Medicare for reimbursement. In that capacity, Davis witnessed that approximately 80% of the claims which Lincare submitted to Medicare in the year that Davis was with the company were based on either false information or supported by documentation that was completed by Lincare's employees, though the documentation should have been completed by physicians. With respect to Medicare/Medicaid patients, Davis witnessed physicians' signatures being forged to

certificates of medical necessity ("CMNs") and that these CMNs would have certain portions completed by Lincare's employees that should have been completed by physicians: diagnosis codes, lengths of need for supplemental oxygen, and unit-dose medications. Davis also witnessed the annual, updating documents that Medicare required being altered, forged, and falsely completed by Lincare's employees. With respect to the VA, Davis witnessed Lincare employees forge VA patients' signatures forged to patient checklists and delivery tickets that were required by the VA for reimbursement of services to occur.

Discovery in the instant matter has been difficult. Though Davis requested all documents evidencing "oxygen sales" for the period of her employment with Lincare as early as May 5, 2004, Lincare has refused to produce any such documents except for two, specific patients that Davis identified by name. Davis has filed motions to extend discovery and to compel the production of these documents, especially the CMNs (Docket Nos. 62, 78, 81, 82, 85, and 86), the briefing was completed, Judge Boyle heard oral argument on March 9, 2005, but Judge Boyle has not yet ruled on the document requests at issue. In turn, pursuant to F.R.C.P. 56(f), Davis has twice moved to extend the time to oppose Lincare's summary judgment efforts (Docket Nos. 97 and 121).

Davis is entitled to the documents that she has requested, but Lincare has refused to produce them. As those documents, especially the CMNs for Medicare patients, are critical for Davis to oppose the instant motion for summary judgment, Davis' position is that she should have an opportunity to review the documents requested and supplement the summary judgment record with affidavits relative to those documents. Davis' work has been doubled or even tripled, because she is required to oppose the instant motion

without the benefit of all of the discovery to which she is entitled and has sought in these proceedings. Davis submits that those documents will establish the veracity of her allegations of Medicare/Medicaid and VA fraud.

Nevertheless, though Lincare has only produced the Medicare billing documents on the two patients specifically identified by Davis as having been patients on whose claims fraudulent billing of Medicare had occurred, Davis has been able to obtain an affidavit from one of these patients' treating pulmonologist, Dr. Janat O'Donnell, M.D., which establishes that Dr. O'Donnell's signature was forged on two, separate Medicare billing documents, including a CMN. *Affidavit of Janat O'Donnell*, M.D., filed previously, at ¶¶3-6. Moreover, Davis can establish that Lincare billed Medicare based on the documents that contained the forged signatures of Dr. O'Donnell, and Lincare did in fact receive payments from Medicare based on these forged documents. *Affidavit of Counsel in Opposition to Defendant's Motion for Summary Judgment*, filed previously, Ex. 27. The documents that demonstrate Medicare's payments to Lincare are known as Explanations of Medicare Benefits ("EOMBs"). The EOMBs relative to Dr. O'Donnell's patient that prove that Medicare paid on the false claims are attached as Exhibit 27 to *Affidavit of Counsel in Opposition to Defendant's Motion for Summary Judgment*, filed previously. That exhibit demonstrates payments made by Medicare to Lincare for the period March 12, 2000, through August 22, 2000, and Dr. O'Donnell's signature was forged by Lincare employees on the Medicare billing documents on March 10, 2000, and March 30, 2000. *Affidavit of Janat O'Donnell*, M.D., filed previously, at ¶¶3-6.

Davis has also sought to obtain the documents that demonstrate Lincare's submissions of claims to Medicare, HCFA 1500 forms, but Lincare has not produced

those on even the two patients specifically identified by Davis as having has fraudulent claims presented to Medicare on their behalves by Lincare. The HCFA 1500 forms are also the subject of motions to compel, motions to extend discovery, and 56(f) motions filed by Plaintiff/Relator.

Despite having been hampered by Lincare at every turn, Davis can present to this Court direct evidence that Lincare's employees forged physicians' signatures on Medicare billing documents (*Plaintiff/Relator's Statement of Disputed Facts in Opposition to Defendant's Motion for Summary Judgment* ("*Disputed Facts*")), filed previously, at §A.1.a., completed or altered diagnosis codes on Medicare CMNs (*Disputed Facts* at §§A.1.b. and A.1.b.1.), completed or altered the length of need sections on Medicare CMNs (*Disputed Facts* at §§A.1.b. and A.1.b.2.), completed unit-dose medication sections on Medicare CMNs (*Disputed Facts* at §§A.1.b. and A.1.b.3.), falsified the annual, updating documents required by Medicare (*Disputed Facts* at §A.1.d.), falsified documents by forging patients' names on documents submitted to the VA for monetary reimbursement of oxygen services (*Disputed Facts* at §§A.2. and A.2.a.), and falsified delivery tickets that were necessary for the VA to pay for Lincare's services (*Disputed Facts* at §§A.2.b. and A.2.d.). Furthermore, Davis can present direct evidence at trial that Lincare in fact submitted these false claims to Medicare and the VA and was paid for these false claims. *Disputed Facts* at §§A.1.c., A.2.c, and A.3.

Davis can also present circumstantial evidence that Medicare/Medicaid and VA fraud were occurring. Davis has consistently maintained that Beagles was involved in the fraud. However, when Beagles falsified company documents relative to Davis, Lincare did not terminate Beagles, though, Lincare always terminates its employees for such

misconduct, Beagles only had part of his incentive bonus taken away for the transgression against the company. *Disputed Facts* at §§4.a., 4.b, 4.c., and 4.d. In fact, Schabel wrote an e-mail to Beagles that specifically stated, in part:

> Brad [Beagles], this is to acknowledge the conversation we had regarding Trudy Davis and the falsification of company documents.
>
> If there are any other issues relating to this subject moving forward, I will be forced to terminate your employment with Lincare.
>
> I will be deducting 5500.00 dollars from your current bonus.

*Affidavit of Counsel in Opposition to Defendant's Motion for Summary Judgment*, filed previously, Ex. 13 (LD000069). There are clearly reasonable inferences from this e-mail that fraudulent activities were occurring at Lincare's Boise center, that Davis had complained about them, and that Schabel wanted Beagles to take steps to prevent the matter from moving forward relative to Davis' complaints. Davis submits that this is circumstantial evidence of the Medicare/Medicaid and VA fraud that was occurring at Lincare's Boise center. Further, Davis clearly complained to Beagles and Mitchell about the fraud. *Disputed Facts* at §B.1. However, Beagles never discussed Davis' complaints with anyone else within Lincare, including the corporate compliance department. *Disputed Facts* at §B.4.g. One reasonable inference from these circumstances is that Beagles was involved in the fraud, as he was unwilling to share Davis' complaints of fraud with anyone within the company.

Lincare ultimately terminated Beagles' employment, because Beagles had phone conversations with Rodriguez, a former center manager in Yakima, Washington, wherein Beagles mentioned that Lincare does not terminate employees for CMN-related conduct and that Lincare knows that improperly-completed CMNs are utilized by Lincare and

fraud is occurring. *Disputed Facts* at §A.4.j. Rodriguez recorded these phone conversations with Beagles, and transcripts of these phone conversations are attached as Exhibit 29 to the *Affidavit of Counsel in Opposition to Defendant's Motion for Summary Judgment*, filed previously.

Other, circumstantial evidence of the fraud is that Beagles and Mitchell tried to bribe Davis, after Davis began voicing her concerns about the Medicare/Medicaid and VA fraud. *Disputed Facts* at §A.4.h. Mitchell testified that Beagles admitted to him that Beagles had offered incentives to Davis to keep her quiet about the concerns of Medicare/Medicaid and VA fraud. *Id.* Beagles even told Mitchell that, after Beagles had obtained the promotion to regional manager, he would terminate Davis over her complaints of fraud. *Disputed Facts* at §B.8. Nevertheless, though Mitchell was Davis' immediate supervisor for most of her employment with Lincare, Beagles would not allow Mitchell to reprimand Davis. *Disputed Facts* at §A.4.k. The inference is that Beagles was trying to avoid "making waves" with Davis, as she had knowledge as to the fraud that was occurring. Other conduct from Beagles and Mitchell raises a reasonable inference that there was something "rotten in Denmark" occurring at Lincare's Boise center.

In e-mails, Mitchell would refer to the, "[S]ituation in Boise that has ruined my career." *Disputed Facts* at §A.4.l. Moreover, Beagles was mailing packages of completed, Medicare CMNs from his office in Utah to the Boise center for Boise patients. Not only was this not proper procedure, it caused Hessing and Rhodes to be concerned that something improper was occurring, and Beagles was altering or falsifying these CMNs. *Disputed Facts* at §A.4.m. Finally, after Mitchell was demoted from his

position as center manager in Boise to a customer service representative in Salt Lake City, Mitchell involved Pedersen (with Lincare's corporate compliance department) in his efforts to regain a center manager position within Lincare. *Disputed Facts* at §A.4.n. There is a reasonable inference here that Lincare's corporate compliance department was trying to keep a lid on the situation in Boise by assisting Mitchell in moving up through the ranks of Lincare again.

During nearly her entire employment with Lincare, Davis witnessed false claims being submitted to Medicare/Medicaid, and the VA. Davis witnessed the following coworkers engage in activities that resulted in false claims being submitted to governmental entities: Douglas Mitchell, Bradley Beagles, Sara Hessing, and Coralyn McLeod. The facts that demonstrate the false and fraudulent conduct by Lincare that resulted in false claims being submitted to Medicare/Medicaid and the VA are outlined in *Plaintiff/Relator's Statement of Disputed Facts in Opposition to Defendant's Motion for Summary Judgment*, filed previously at §§A. through A.4.n.

In direct contradiction to Lincare's assertions in its briefing supporting the instant motion, Davis can demonstrate the false and fraudulent claims for reimbursement that Lincare submitted to governmental entities for payment and reimbursement. Though Lincare has stymied Davis' efforts as much as possible, the truth will prevail, as Dr. O'Donnell has now confirmed that her signature was forged on CMNs, and witnesses other than Davis have testified that Medicare CMNs were falsely and fraudulently completed and VA billing documents forged by Lincare's employees.

Initially, Davis complained to her immediate supervisor, Mitchell, who was also engaged in the wrongdoings, about the Medicare/Medicaid and VA fraud. *Disputed*

*Facts* at §§B. and B.1.  Once she determined that Mitchell would not discontinue his fraudulent and false billing of Medicare/Medicaid and the VA, she complained to Beagles, Mitchell's supervisor.  *Id.*  Though Beagles stated that he would address the fraud, he never did so, and Davis ultimately determined that even Beagles was engaged in the fraud.  *Id.*  Beagles tried to bribe Davis to not blow the whistle on the fraud.  *Disputed Facts* at §A.4.h.  Ultimately, Beagles promoted Davis to the position of center manager at Lincare's Boise center after Mitchell had vacated that position.  *Disputed Facts* at §§B.9., B.10., and B.12.  Beagles thereafter followed Davis to her attorney's office with Hessing and McLeod.  *Disputed Facts* at §§B.2. and B.3.  A reasonable inference exists that Beagles became aware that Davis was likely speaking to an attorney about the fraud that was occurring at the Boise center and then revoked the promotion to center manager that he had awarded to Davis.

On Beagles' recommendation, Lincare paid for Davis to attend a center manager training course in Denver, Colorado.  Davis attended this course prior to Beagles becoming aware that Davis was seeing an attorney.  Obviously, there are reasonable inferences here that Davis was qualified for the center manager position and had received the promotion; otherwise, Lincare would not have sent Davis to the training in Denver. *Disputed Facts* at §§B.9. and B.12.  Further, there is substantial, competent evidence in the record that Davis was qualified for the center manager position, that neither seniority (Davis had only been with Lincare for eleven months) nor a current, Idaho respiratory therapy license (which Davis did not have) were prerequisites for the center manager position that Davis received, and that Beagles had the authority to promote Davis, on his own, into the center manager position at the Boise center. *Disputed Facts* at §§B.6., B.7.,

B.9., and B.10.  There is also substantial, competent evidence in the record that Davis had in fact received the promotion to center manager.  *Disputed Facts* at §B.12.

Upon her return from the center manager training in Denver, Beagles demanded that Davis engage in the fraud by falsifying a Medicare CMN.  Davis refused.  In retaliation for Davis' refusal to engage in the fraud and her continued complaints that the fraud was occurring, Beagles revoked the promotion to center manager that he had awarded Davis and then terminated Davis' employment with Lincare, and other employees at Lincare's Boise center, Hessing and Rhodes, also feared that such retaliation would occur.  *Disputed Facts* at §§B. and B.8.  By drafting a written reprimand, Mitchell also retaliated against Davis for complaining about the fraud.  *Disputed Facts* at §B.13.

The record is replete with evidence that Davis had complained about the Medicare/Medicaid and VA fraud that was occurring at the Boise center.  *Disputed Facts* at §B.1.  After revoking the promotion to center manager but prior to terminating Davis, Beagles also threatened Davis' life and the well-being of her family, and Davis filed a complaint with the Caldwell Police Department relative to that conduct.

To assist the Court in reviewing this memorandum and the other papers opposing Lincare's summary judgment, Davis provides the following cast of characters for the Court's convenience:

**TRUDY DAVIS ("Davis" or "Relator")** -- Relator in the instant action; was employed by Lincare as a customer service representative from October 7, 1999 to September 22, 2000; during her employment with Lincare, Davis was the individual primarily responsible for the handling of Medicare documents and submitting those

documents to Lincare's Regional Billing and Collections Office ("RBCO") in Spokane, Washington;

**DARRELL DAVIS** -- Relator's husband who witnessed Medicare fraud occurring at Lincare's Boise center, as he was often at Lincare's Boise center either doing handyman jobs or dropping off or picking up his wife for work;

**CATHY RHODES ("Rhodes")** -- also a customer service representative at Lincare's Boise center; during Davis' employment with Lincare, Rhodes was the individual primarily responsible for handling VA documents and submitting those documents to Lincare's Spokane RBCO for submission to the VA for payment and reimbursement;

**SARA HESSING ("Hessing")** -- a respiratory therapist at Lincare's Boise center; admits to false and fraudulent conduct with respect to both Medicare patients as well as VA patients;

**CORALYN McLEOD ("McLeod")** a respiratory therapist at Lincare's Boise center; admits to false and fraudulent conduct with respect to both Medicare patients as well as VA patients;

**DOUGLAS MITCHELL ("Mitchell")** -- former center manager at Lincare's Boise center; demoted to customer service representative in Salt Lake City after leaving Boise; writes e-mails referencing, "[T]he situation in Boise that has ruined my career;"

**BRADLEY BEAGLES ("Beagles")** -- former regional manager for Lincare; at the times of Davis' employment with Lincare, Beagles was the area manager over the Boise center and was the direct supervisor of Mitchell; implicated in the Medicare and VA fraud by both Hessing and Davis; terminated from Lincare for speaking with John

Rodriguez, a former center manager in Yakima, Washington, and encouraging him to sue Lincare, as Lincare does not terminate employees for engaging in fraudulent conduct related to Medicare CMNs;

**JOE ELMER ("Elmer")** -- formerly the direct supervisor of Beagles, while Davis was employed with Lincare; former regional manager over the Boise center; Beagles did not report any of the fraud at the Boise center to him;

**JOHN RODRIGUEZ ("Rodriguez")** -- former center manager in Yakima, Washington; made audiotape recordings of telephone conversations he had with Beagles, wherein false CMNs are discussed, and Beagles encourages Rodriguez to bring a lawsuit against Lincare for wrongful termination of employment;

**RICHARD WALTERS ("Walters")** -- former, senior vice-president with Lincare; was Beagles' direct supervisor for a period of time; Beagles did not report any of the fraud at the Boise center to him;

**JENNA PEDERSEN ("Pedersen")** -- current Corporate Compliance Officer with Lincare; supervised the corporate compliance division of Lincare; performs "compliance reviews" of Lincare centers and RBCOs to determine whether compliance with the health care laws is occurring; 30(b)(6) deponent of Lincare on compliance issues;

**SHEILA DILLEY ("Dilley")** -- 30(b)(6) deponent of Lincare on human resources issues;

**PHILIP PHENIS ("Phenis")** -- 30(b)(6) deponent of Lincare on billing and collection issues, including Medicare/Medicaid and the VA;

**SHAWN SCHABEL** ("Schabel") -- current Chief Operating Officer for Lincare; began with Lincare in 1989 as a respiratory therapist; disciplined Beagles for falsifying documents relative to Davis and terminated Beagles for having had conversations with Rodriguez; also threatened in an e-mail to terminate Beagles, if the issue of "Trudy Davis and the falsification of company documents...moved forward...."

## APPLICABLE STANDARD FOR SUMMARY JUDGMENT

Summary judgment is only to be granted when the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). "The movant must discharge the burden the Rules place upon him: It is not enough to move for summary judgment with a conclusory assertion that the plaintiff has no evidence to prove his case." *Celotex Corp.*, 477 U.S. at 328, 106 S.Ct. at 2555, 91 L.Ed.2d 265 (1986).

The burden facing a defendant moving for summary judgment is a difficult one. *Willis v. Roche Biomedical Laboratories, Inc.*, 21 F.3d 1368, 1371-1372 (5th Cir. 1994). "...[C]ourts must be vigilant in determining whether either an inference or circumstantial evidence might suffice to create the existence of a factual dispute about the claim, lest courts use summary judgment as a 'catch penny contrivance to take unwary litigants into [their] toils and deprive [the litigants] of a trial [to which they are actually entitled].'" *Fontenot v. Upjohn*, 780 F.2d 1190, 1197 (5th Cir. 1986).

"At the summary judgment stage, the judge's function is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Indeed, a court's determination of a summary judgment motion requires deference to the nonmoving party, and any doubt as to the existence of a genuine issue for trial should be resolved in favor of the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970).

## ARGUMENTS AND AUTHORITIES

I.   **TRIABLE ISSUES OF FACT PRECLUDE THE ENTRY OF SUMMARY JUDGMENT ON PLAINTIFF/RELATOR'S SUBSTANTIVE FCA CLAIMS PURSUANT TO 31 U.S.C. §3730(a)(1) and (2).**

**A. Substantive FCA Claims.**

The FCA was enacted during the Civil War with the purpose of forfending widespread fraud by government contractors who were submitting inflated invoices and shipping faulty goods to the government. *U.S. v. Rivera*, 55 F.3d 703, 709 (1st Cir. 1995). In furthering this goal, the FCA attaches liability, not to underlying fraudulent activity, but to the "claim for payment." *Id.* What constitutes the FCA offense is the knowing presentation of a claim that is either fraudulent or simply false. *U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261, 1265-1266 (9th Cir. 1996) (citing *U.S. ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991)); *see also U.S. v. Rivera*, 55 F.3d 703 (1st Cir. 1995).

In the case at bar, Davis has consistently maintained that Lincare engaged in fraud and submitted false claims to governmental entities, when it altered and falsified the

billing documents that it submitted to Medicare, Medicaid, and the VA. Davis can present substantial competent evidence at trial that Lincare engaged in the precise conduct about which she has complained for almost the past, five years. Lincare can no longer run from Davis' allegations.

The FCA allows the government to recover, when the false claims arise from improper certifications made to the government. *See, e.g., U.S. v. Hibbs*, 568 F.2d 347 (3rd Cir. 1977) (applying the FCA in the context of a real estate broker submitting inaccurate certifications as to real estate upon which the United States government guaranteed mortgages); *U.S. ex rel. Barrett v. Columbia/HCA Healthcare Corp.*, 251 F.Upp.2d 28, 32 (D.D.C. 2003) (holding the FCA to be violated, when a government contract or program requires compliance with certain conditions as a prerequisite to governmental payment of a claim, and a defendant has failed to comply with those conditions, and a defendant has falsely certified that it had complied with the conditions in order to induce the government to pay the claims). In the case *sub judice*, a similar analysis should apply, as Lincare has falsified Medicare/Medicaid forms, especially CMNs, and VA forms to induce the government to pay on claims.

Davis can present direct evidence at trial that Lincare employees forged physicians' signatures on CMNs (*Disputed Facts* at §§A.1. and A.1.a. – Davis alleged that Dr. O'Donnell's signature was forged in ¶13 of the *Second Amended Complaint and Demand for Jury Trial* ("*SAC*") (Docket No. 34); such allegation has now been proven true in Dr. ODonnell's affidavit), completed or altered diagnosis codes on CMNs (*Disputed Facts* at §§A.1.b. and A.1.b.1.), completed or altered the length of need sections on CMNs (*Disputed Facts* at §§A.1.b. and A.1.b.2.), completed unit-dose

medication sections on CMNs (*Disputed Facts* at §§A.1.b. and A.1.b.3.), falsified the annual, updating documents required by Medicare (*Disputed Facts* at §A.1.d.), falsified documents by forging patients' names on documents submitted to the VA for monetary reimbursement for oxygen services (*Disputed Facts* at §§A.2. and A.2.a.), and falsified delivery tickets that were necessary for the VA to pay for Lincare's services (*Disputed Facts* at §§A.2.b. and A.2.d.). Furthermore, Davis can present direct evidence at trial that Lincare in fact submitted these false claims to Medicare and the VA and was paid for these false claims. *Disputed Facts* at §§A.1.c., A.2.c, and A.3.). Davis' expert witness, Gary Thietten, who has over thirty years of experience in the home health care and durable medical equipment industry, including supplemental oxygen, has opined that Lincare has submitted false claims to both Medicare and the VA under the facts of this case. *Affidavit of Counsel in Opposition to Defendant's Motion for Summary Judgment*, filed previously, Ex. 31.

Moreover, Davis can also present strong, circumstantial evidence at trial that Lincare submitted false claims to the government for reimbursement. Davis can also present circumstantial evidence that Medicare/Medicaid and VA fraud were occurring. Davis has consistently maintained that Beagles was involved in the fraud. However, when Beagles falsified company documents relative to Davis, Lincare did not terminate Beagles, though, Lincare always terminates its employees for such misconduct, Beagles only had part of his incentive bonus taken away for the transgression against the company. *Disputed Facts* at §§4.a., 4.b, 4.c., and 4.d. In fact, Schabel wrote an e-mail to Beagles that specifically stated, in part:

> Brad [Beagles], this is to acknowledge the conversation we
> had regarding Trudy Davis and the falsification of company
> documents.
>
> If there are any other issues relating to this subject
> moving forward, I will be forced to terminate your
> employment with Lincare.
>
> I will be deducting 5500.00 dollars from your
> current bonus.

*Affidavit of Counsel in Opposition to Defendant's Motion for Summary Judgment*, filed previously, Ex. 13 (LD000069). There are clearly reasonable inferences from this e-mail that fraudulent activities were occurring at Lincare's Boise center, that Davis had complained about them, and that Schabel wanted Beagles to take steps to prevent the matter from moving forward relative to Davis' complaints. Davis submits that this is circumstantial evidence of the Medicare/Medicaid and VA fraud that was occurring at Lincare's Boise center. Further, Davis clearly complained to Beagles and Mitchell about the fraud. *Disputed Facts* at §B.1. However, Beagles never discussed Davis' complaints with anyone else within Lincare, including the corporate compliance department. *Disputed Facts* at §B.4.g. One reasonable inference from these circumstances is that Beagles was involved in the fraud, as he was unwilling to share Davis' complaints of fraud with anyone within the company.

Lincare ultimately terminated Beagles' employment, because Beagles had phone conversations with Rodriguez, a former center manager in Yakima, Washington, wherein Beagles mentioned that Lincare does not terminate employees for CMN-related conduct and that Lincare knows that improperly-completed CMNs are utilized by Lincare and fraud is occurring. *Disputed Facts* at §A.4.j. Rodriguez recorded these phone conversations with Beagles, and transcripts of these phone conversations are attached as

Exhibit 29 to the *Affidavit of Counsel in Opposition to Defendant's Motion for Summary Judgment*, filed previously.

Other, circumstantial evidence of the fraud is that Beagles and Mitchell tried to bribe Davis, after Davis began voicing her concerns about the Medicare/Medicaid and VA fraud. *Disputed Facts* at §A.4.h. Mitchell testified that Beagles admitted to him that Beagles had offered incentives to Davis to keep her quiet about the concerns of Medicare/Medicaid and VA fraud. *Id.* Beagles even told Mitchell that, after Beagles had obtained the promotion to regional manager, he would terminate Davis over her complaints of fraud. *Disputed Facts* at §B.8. Nevertheless, though Mitchell was Davis' immediate supervisor for most of her employment with Lincare, Beagles would not allow Mitchell to reprimand Davis. *Disputed Facts* at §A.4.k. The inference is that Beagles was trying to avoid "making waves" with Davis, as she had knowledge as to the fraud that was occurring. Other conduct from Beagles and Mitchell raises a reasonable inference that there was something "rotten in Denmark" occurring at Lincare's Boise center.

In e-mails, Mitchell would refer to the, "[S]ituation in Boise that has ruined my career." *Disputed Facts* at §A.4.l. Moreover, Beagles was mailing packages of completed, Medicare CMNs from his office in Utah to the Boise center for Boise patients. Not only was this not proper procedure, it caused Hessing and Rhodes to be concerned that something improper was occurring, and Beagles was altering or falsifying these CMNs. *Disputed Facts* at §A.4.m. Finally, after Mitchell was demoted from his position as center manager in Boise to a customer service representative in Salt Lake City, Mitchell involved Pedersen (with Lincare's corporate compliance department) in

his efforts to regain a center manager position within Lincare. *Disputed Facts* at §A.4.n. There is a reasonable inference here that Lincare's corporate compliance department was trying to "keep a lid" on the situation in Boise by assisting Mitchell in moving up through the ranks of Lincare again.

On the record presently before this Court, Plaintiff/Relator can demonstrate genuine issues of material fact that Lincare submitted false claims to Medicare/Medicaid and VA. *Disputed Facts* at §§A. through A.4.n. With the existence of this evidence in the record, particularly Dr. O'Donnell's affidavit that her signature was forged on Medicare billing documents coupled with EOMBs that demonstrate that Medicare paid Lincare based on these forged documents, the substantive FCA claims in the instant action raise genuine issues of material fact which preclude the entry of summary judgment on those claims.


## B. Subject Matter Jurisdiction Under the FCA.

In its motion for summary judgment, Lincare now asserts at this late date that this Court does not have subject matter jurisdiction to adjudicate the substantive, FCA claims that are asserted in the instant litigation. Lincare now asserts, despite having had years to do so, that 31 U.S.C. §3730(b)(5) is a jurisdictional bar to Davis' substantive FCA claims on behalf of the U.S. government. However, such a position does not mandate dismissal of all of Davis' substantive FCA claims in the case *sub judice*.

As part of the FCA, 31 U.S.C. §3730(b)(5) states:

> When a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action.

In order for Lincare's argument to be effective, the instant action must be a "related action" to an action that was filed prior to the initiation of the instant action, and the instant action must also be "based on the facts underlying the pending action." This jurisdictional bar is commonly known as the first-to-file rule.

In conducting an inquiry under 31 U.S.C. §3730(b)(5)'s first-to-file rule, a court is to conduct a claim-by-claim analysis to determine, if the rule even applies. *U.S. ex rel. Merena v. SmithKline Beecham Corp.*, 205 F.3d 97, (3rd Cir. 2000). That is, in the case at bar, this Court must compare the allegations of this action with those allegations from an earlier-filed case. Lincare asserts that the case of *U.S. ex re. Corsello , et al., v. Lincare, Inc., et al. ("Corsello")*, United States District Court for the Northern District of Georgia Case No. 1:98-CV-00204-ODE (filed on January 22, 1998) prevents this Court from having jurisdiction of the subject matter in the instant litigation. However, there are significant and material differences between the allegations contained in the operative complaint in the instant matter and the allegations contained in *Corsello*; most notably, VA fraud is not alleged in *Corsello*, as it is in the instant case. Akin to the analysis in *Merena*, the claims of VA fraud in the instant action were not raised in *Corsello*, and thus this Court has subject matter jurisdiction to adjudicate them. *Merena*, 205 F.3d at 100.

Further, Lincare's subject matter jurisdiction argument has no effect on Davis' employment retaliation claim under 31 U.S.C. §3730(h). *See, e.g., U.S. ex rel. Barrett v. Columbia/HCA Healthcare Corp.*, 251 F.Upp.2d 28, 37-38 (D.D.C. 2003). In other words, dismissal of some or even all of the substantive FCA claims for lack of subject matter jurisdiction does not necessitate the dismissal of Davis' employment retaliation claim under 31 U.S.C. §3730(h). With respect to the substantive FCA claims in this

litigation, Lincare's subject matter jurisdiction argument also does not mandate that summary judgment be entered in this case.

The *Corsello* case does not allege any fraud perpetrated against the VA and does not allege any alterations or forgeries of VA patient checklists and delivery tickets. The instant action does make such allegations of VA fraud against Lincare. *Second Amended Complaint and Demand for Jury Trial ("SAC")* (Docket No. 34) at ¶¶14, 15, 25, 34, 59, 60, and 61. In turn, the instant action is wholly distinct from *Corsello*, and subject matter jurisdiction over the entire dispute lies with this Court. At a minimum, those claims of VA fraud that Plaintiff/Relator have alleged are well outside of any allegations in *Corsello*. In turn, 31 U.S.C. §3730(b)(5) does not pose a jurisdictional bar in the instant action, as Plaintiff/Relator's claims for VA fraud are not, "[B]ased on the facts underlying a pending action."

Also, the instant action is not a parasitic action to *Corsello*. The purpose of the first-to-file rule is to prevent parasitic actions from occurring. *U.S. ex rel. LaCorte v. Wagner*, 185 F.3d 188, 191 (4th Cir. 1999) (citing *U.S. ex rel. S. Prawer & Co. v. Fleet Bank of Maine*, 24 F.3d 320, 326 (1st Cir. 1994)). The instant action is not an action parasitic to *Corsello*, as Davis acquired the information that was the basis of her suit on her own, shared it with governmental authorities prior to bringing suit, and had no knowledge that the *Corsello* complaint had even been filed at the time she filed the instant action. As the instant action is not parasitic to *Corsello*, then it should not be dismissed for lack of subject matter jurisdiction. *Fleet Bank*, 24 F.3d at 327-328.

During the proceedings that occurred in this action prior to Lincare answering the complaint in the instant matter, Lincare moved to dismiss this action based on lack of

subject matter jurisdiction. (Docket No. 15). This Court ultimately denied that motion finding, in part, that Davis was an original source, pursuant to 31 U.S.C. §3730(e)(4)A), of the information contained in her complaint.

Presently, *Corsello* is dismissed, and a notice of appeal has been filed, and the operative complaint, the fifth amended complaint in the action, prior to the appeal being taken only alleged an employment retaliation claim under 31 U.S.C. §3730(h). Lincare's attorneys did not raise these facts in their moving in support of the instant motion. This is particularly quizzical, when one realizes that those lawyers had knowledge of these facts, as Lincare's lawyers in *Corsello* are the same as Lincare's lawyers in the instant action with the exception of local counsel in Idaho.

Finally, it should also be noted that, should any portion of Plaintiff/Relator's claims in the instant action be dismissed for lack of subject matter jurisdiction, then any dismissal is without prejudice. *See, e.g., Hernandez v. Conriv Realty Associates*, 182 F.3d 121, 122 (2nd Cir. 1999).

## II.    TRIABLE ISSUES OF FACT PRECLUDE THE ENTRY OF SUMMARY JUDGMENT ON RELATOR'S EMPLOYMENT RETALIATION CLAIM PURSUANT TO 31 U.S.C §3730(h).

Davis, as Relator in the instant action, is a whistleblower. She complained to Lincare repeatedly about the false and fraudulent claims that were being submitted to Medicare, Medicaid, and the VA. *Disputed Facts* at §B.1. Though Lincare promoted Davis to the center manager position, it later revoked that promotion and wrongfully terminated/constructively discharged from her employment with Lincare as a result of her reporting of the fraud perpetrated against governmental entities by Lincare. Davis can

demonstrate triable issues of act as to her claim for employment retaliation under the FCA; as such, summary judgment is inappropriate in the case at bar on Davis' employment claims.

Pursuant to 31 U.S.C. §3730(h):

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

This section prohibits precisely the type of retaliation to which Davis was subjected at the end of her employment with Lincare. Lincare discriminated against Davis, when it revoked her promotion to center manager and ultimately terminated/constructively discharged her for having complained about the Medicare/Medicaid and VA fraud that was occurring at Lincare's Boise center. Genuine issues of material fact exist which preclude the entry of summary judgment on Davis' 3730(h) claim for employment retaliation and discrimination. A jury could certainly make such findings, given the following timeline:

**October 7, 1999** -- Davis begins her employment with Lincare as a customer service representative;

**April 2000** – Davis complains to Mitchell about the falsification of Medicare CMNs; *Disputed Facts* at §B.1.;

**April 25, 2000** -- Mitchell drafts a written reprimand to Davis; *Affidavit of Counsel in Opposition to Defendant's Motion for Summary Judgment*, filed previously, Ex. 20;

**July 20, 2000** -- according to Beagles' handwritten notes, Davis meets with Beagles at Perkins Restaurant in Boise and complains about Medicare/Medicaid and VA fraud; Beagles' handwritten notes contain a reference Davis' complaints of "irregularities;" *Disputed Facts* at §B.1.; *Affidavit of Counsel in Opposition to Defendant's Motion for Summary Judgment*, filed previously, Ex. 18, 21, and 22;

**August 18, 2000 through September 9, 2000** -- Beagles and Walters exchange e-mails that Davis would be a good candidate for the center manager position at the Boise center and that Walters would like to interview Davis for that position and send Davis to Denver for center manager training; *Affidavit of Counsel in Opposition to Defendant's Motion for Summary Judgment*, filed previously, Ex. 17 and 24;

**September 7, 2000** -- Lincare sends Davis to the center manager training course in Denver, Colorado, that is for "**all new center managers**;" the attendees at the seminar, "**[S]hall be the Area and Region Managers of tomorrow**; within Lincare, Region Managers supervise Area Managers, and Area Managers supervise Center Managers;" *Affidavit of Counsel in Opposition to Defendant's Motion for Summary Judgment*, filed previously, Ex. 24, 25 (emphasis added), and 26 (emphasis added);

**September 16, 2000** -- Beagles writes letter to Davis that specifically mentions, "On July 20[th] 2000 (sic) you disclosed that you were concerned that a violation of Lincares (sic) Corporate Healthcare Compliance policy had occurred in the Boise (sic)

Idaho center…;" *Affidavit of Counsel in Opposition to Defendant's Motion for Summary Judgment*, filed previously, Ex. 21 and 22;

**September 16, 2000** -- Beagles, Hessing, and McLeod follow Davis to her attorney's office; *Disputed Facts* at §§B.2. and B.3.

**September 16, 2000** -- Beagles threatens Davis' life and her family's well-being due to Davis' complaints of Medicare/Medicaid fraud; Davis files a report with the Caldwell Police Department regarding these threats; *Affidavit of Counsel in Opposition to Defendant's Motion for Summary Judgment*, filed previously, Ex. 30;

**September 19, 2000** -- according to his handwritten notes, Beagles met with Davis at Perkins Restaurant in Boise and discussed his letter of September 16, 2000, which references healthcare law compliance violations; Davis refuses to sign the letter; Davis requests a leave of absence from Beagles; Beagles had the authority to grant Davis a leave of absence; *Affidavit of Counsel in Opposition to Defendant's Motion for Summary Judgment*, filed previously, Ex. 19; *Disputed Facts* at §B.5.;

**September 19, 2000** -- Beagles drafts a termination/forced resignation letter to Davis on the basis of alleged absenteeism, though he had met previously with Davis on this same day and even discussed a leave of absence; *Affidavit of Counsel in Opposition to Defendant's Motion for Summary Judgment*, filed previously, Ex. 23;

**September 22, 2000** -- Davis attempts to call Beagles relative to her employment with Lincare, but she is never able to reach Beagles; Lincare terminates Davis' employment.

The elements for employment retaliation under 31 U.S.C. §3730(h) are: (1) the employee must have been engaging in conduct protected under the FCA, (2) the

employer must have known that the employee was engaging in such, protected conduct, and (3) the employer must have discriminated against the employee because of his or her protected conduct. *U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261, 1269 (9th Cir. 1996); *Hutchins v. Wilentz*, 253 F.3d 176 (3rd Cir. 2001). In the case at bar, Davis can demonstrate that genuine issues of material fact exist as to each of these elements; in turn, summary judgment is not appropriate on Davis' §3730(h) claim.

First, the record certainly discloses a cornucopia of evidence that Davis engaged in conduct protected under the FCA (i.e. complaints of Medicare/Medicaid and VA fraud). *Disputed Facts* at §B.1.

Second, this same evidence demonstrates that Lincare, through Beagles and Mitchell, had knowledge that Davis was engaging in conduct protected under the FCA. *Id.* Beagles' own handwritten notes from meetings with Davis even memorialize that Davis complained to Beagles about "irregularities" and "compliance policy issues." *Affidavit of Counsel in Opposition to Defendant's Motion for Summary Judgment*, filed previously, Ex. 18 and 19. Beagles, McLeod, and Hessing even followed Davis to her attorney's office. *Disputed Facts* at §§B.2. and B.3.

Third, evidence in the record demonstrates that Lincare discriminated against Davis, because she engaged in FCA-protected activity. Hessing and Rhodes feared that such retaliation would occur at Lincare. *Disputed Facts* at §B. Though Davis was promoted to center manager, that promotion was revoked, though Davis was qualified for the position. *Disputed Facts* at §B.9. and B.12. Ultimately, Lincare terminated Davis. *Disputed Facts* at §B.8.

Bearing in mind the timeline, from October 7, 2000, through September 22, 2000, set forth above, there is a very close, temporal proximity between Davis' complaints of compliance violations (i.e. Medicare/Medicaid and VA fraud) on July 20, 2000, and September 19, 2000, and Beagles revocation of the promotion of Davis to center manager and then the writing of the termination letter on September 19, 2000. Further, Beagles does not authorize the leave of absence that Davis requested on September 19, 2000, though he had authority to do so. Based on the foregoing, Davis submits that there is very strong evidence of a causal connection between her complaints of fraud and the revocation of her promotion and the termination of her employment with Lincare.

To establish that one is discriminated against because of engaging in FCA-protected activity, the whistleblower/employee must show that employer had knowledge that employee was engaged in protected activity, and that retaliation was motivated, at least in part, by employee's engaging in that activity. *U.S. ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731 (D.C.App. 1998). However, in order to enjoy whistleblower protection, an employee need not advise his employer that she has filed or is contemplating filing a *qui tam* complaint. *Id.* Internal reporting within the company of fraud triggers whistleblower protection. *See, e.g., McKenzie v. BellSouth Telecommunications, Inc.*, 219 F.3d 508 (6th Cir. 2000). The purpose of this statute is served by construing whistleblowing protection broadly to cover employees who have made intra-corporate complaints about fraud against government. *Hopkins v. Actions, Inc.*, 985 F.Supp. 706 (S.D.Tex. 1997). Such a policy would be furthered by affording Davis the whistleblower protection she deserves in the case at bar.

For purposes of whistleblower protection under 31 U.S.C. §3730(h), an employee engages in protected activity, where the employee in good faith believes, and a reasonable employee in the same or similar circumstances might believe, that the employer is possibly committing fraud against the government. *Moore v. Cal. Inst. Of Tech. Jet Propulsion Lab.*, 275 F.3d 838, 845-846 (9th Cir. 2002). In the case *sub judice*, Davis can demonstrate this. An employer's behavior constitutes employment retaliation under the FCA, for purposes of whistleblower protection, if it would be sufficient to constitute adverse employment action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.*; thus, conduct may be cognizable as discrimination under the FCA, if it is reasonably likely to deter employees from engaging in activity protected thereunder. *Id.* Davis can clearly make this showing, as the revocation of her promotion to center manager and her termination from employment are reasonably likely to deter employees from engaging in the conduct in which Davis engaged. Moreover, much as in Title VII cases, an employer's intent is difficult to discern and frequently avoids direct proof with the knowledge and intent borne solely in the minds of the employer's decisionmakers. When proof of intent is such an important part of a claim, then summary judgment is often inappropriate.

In *Cordova v. State Farm Ins. Co.*, 124 F.3d 1145 (9th Cir. 1997), the Ninth Circuit held:

> The requisite degree of proof necessary to establish a *prima facie* case for Title VII . . . on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis*, 26 F.3d at 889; see, also, *Sischo-Nownejad v. Merced Community College Dist.*, 934 F.2d 1104, 1111 (9th Cir. 1991) ("The amount [of evidence] that must be produced in order to create a *prima facie* case is 'very little.'"). "The *prima facie* case

> may be based either on a presumption arising from the
> factors such as those set forth in *McDonnell Douglas . . .*,
> or by more direct evidence of discriminatory intent."
> *Wallis*, 26 F.3d at 889 (citation omitted).

*Cordova*, 124 F.3d at 1148 (emphasis added). *Cordova* provides us with important

comparisons. The establishment of a *prima facie* case under Title VII, similar to the

establishment of an employment retaliation claim under the FCA, is not a difficult matter.

*Id.; see, also, Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889-890 (9th Cir. 1994); *Yartzoff v.*

*Thomas*, 809 F.2d 1371, 1375 (9th Cir. 1987), *cert. denied*, 498 U.S. 939 (1990); *Sischo-*

*Nownejad v. Merced Community College Dist.*, 934 F.2d 1104, 1111 (9th Cir. 1991);

*Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S. Ct. 1089, 1095,

67 L. Ed. 2d 207, (1981) (holding "[E]stablishment of the *prima facie* case in effect

creates a presumption that the employer unlawfully discriminated against the

employee."); *see, generally, Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1219 (9th Cir.

1998).

As intent is an element of an employment retaliation claim under the FCA, extra

scrutiny must be used in reviewing a party's request for summary adjudication.

Insightful guidance has been presented on this point by other courts:

> Because questions of motive and intent are normally
> inappropriate for summary disposition, if "'[A] plaintiff has
> established a *prima facie* inference of disparate treatment
> through direct or circumstantial evidence of discriminatory
> intent, he will necessarily have raised a genuine issue of
> material fact'" with respect to the legitimacy of the
> defendant's articulated reason for its actions. *Sischo-*
> *Nownejad v. Merced Community College Dist.*, 934 F.2d
> 1104, 1111 (9th Cir. 1991), (emphasis in original), quoting
> *Lowe v. City of Monrovia*, 775 F.2d 998, 1009 (9th Cir.
> 1985), as amended, 784 F.2d 1407 (9th Cir. 1986).
> Therefore, in Title VII claims where questions of motive
> and intent are at issue, once the plaintiff meets her initial

burden of establishing a *prima facie* case, summary judgment should normally be denied. *Id.*

*Carmen v. San Francisco Unified Sch. Dist.*, 1997 U.S.Dist. LEXIS 18766 (N.D.Cal. 1997) (emphasis added). With this guidance, Davis submits that this Court should be very reluctant to enter summary judgment in favor of Lincare, as Davis can demonstrate her *prima facie* case of whistleblowing retaliation, as outlined above, and Lincare's intent is a central focus in this case. Moreover, if a rational trier of fact could, on all the evidence, find that the employer's action was taken for impermissibly discriminatory reasons, summary judgment for the defense is inappropriate. *Wallis*, 26 F.3d at 889-890; *Lowe v. City of Monrovia*, 775 F.2d 998, 1009 (9th Cir. 1985). Such is the case in the instant matter. A reasonable jury could conclude from the evidence outlined herein that Lincare revoked the promotion to center manager and then terminated Davis, because she was complaining of Medicare/Medicaid fraud. Basically, though, Davis anticipates that Lincare will claim that it terminated her, because she abandoned her job. Such a rationale is purely a pretext on Lincare's part. *Affidavit of Counsel in Opposition to Defendant's Motion for Summary Judgment*, filed previously, Ex. 23 (Beagles' letter to Davis of September 19, 2000, stating, "This letter is to notify you that as a result of your being absent from work...."). At a minimum, summary judgment cannot be granted on this basis, as material issues of fact exist as to what Lincare's motivation was in revoking the promotion it extended to Davis and then terminating her; basically, Davis can demonstrate that such a stated reason would be pretextual. After all, Beagles writes the termination letter to Davis on September 19, 2000, which is the same date that Davis is complaining to Beagles about Medicare/Medicaid and VA fraud at the Perkins Restaurant in Boise.

In addressing the issues related to employers' pretexts, the Ninth Circuit has held:

> In evaluating whether the defendant's articulated reason is pretextual, the trier of fact must, at a minimum, consider the same evidence that the plaintiff introduced to establish her *prima facie* case. When that evidence, direct or circumstantial, consists of more than the [prima facie] presumption, a factual question will almost always exist with respect to any claim of nondiscriminatory reason. *Id.* (internal citation omitted) (emphasis added). *Sischo-Nownejad*, thus, read as a whole, stands for the proposition that in deciding whether an issue of fact has been created about the credibility of the employer's nondiscriminatory reasons, the district court must look at the evidence supporting the *prima facie* case, as well as the other evidence offered by the plaintiff to rebut the employer's offered reasons.

*Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889-890 (9th Cir. 1994); *see, also, Cordova*, 124 F.3d at 1150. Issues of motive and intent are best left to a jury. *Sischo-Nownejad v. Merced Community College Dist.*, 934 F.2d 1104, 1111 (9th Cir. 1991); *Lowe v. City of Monrovia*, 775 F.2d 998, 1009 (9th Cir. 1985); *Carmen v. San Francisco Unified Sch. Dist.*, 1997 U.S.Dist. LEXIS 18766 (N.D.Cal. 1997). Therefore, summary adjudication of claims that turn on motive and intent should only exist when there is absolutely no set of facts which would allow a plaintiff to recover. Such is not the situation in the case at bar. Davis can produce both direct and circumstantial evidence of discriminatory intent and pretext as well as the fact she engaged in FCA-protected conduct, Lincare knew about it, and Lincare then discriminated against Davis for having engaged in that conduct. Consequently, summary judgment is not proper in this litigation.

## CONCLUSION

Based on the foregoing arguments and authorities, Plaintiff/Relator respectfully request that Lincare's *Motion for Summary Judgment* (Docket No. 100) be denied in its entirety and that this Court enter its order retaining this case on its trial calendar and stating that genuine issues of material fact exist which preclude the entry of summary judgment on any of the bases asserted by Lincare.

DATED: This 3rd day of May, 2005.

JOHNSON & MONTELEONE, L.L.P.

Jason R.N. Monteleone
Attorneys for Plaintiff

## CERTIFICATE OF MAILING, DELIVERY, OR FACSIMILE TRANSMISSION

I CERTIFY that on May 3, 2005, I caused a true and correct copy of the foregoing document to be:

| | |
|---|---|
| ☐ mailed<br>☐ hand delivered<br>☑ CM/ECF Electronic Filing<br>☐ transmitted fax machine<br>    to: | P. Craig Storti, Esq.<br>Steven W. Berenter, Esq.<br>HAWLEY TROXELL ENNIS & HAWLEY, L.L.P.<br>877 Main Street, Suite 1000<br>P. O. Box 1617<br>Boise, ID  83701-1617<br>(208) 342-3829 (facsimile) |
| ☐ mailed<br>☐ hand delivered<br>☑ CM/ECF Electronic Filing<br>☐ transmitted fax machine<br>    to: | John E. Floyd, Esq.<br>Ben E. Fox, Esq.<br>BONDURANT, MIXSON & ELMORE<br>1201 West Peachtree Street, 39th Floor<br>Atlanta, Georgia  30309<br>(404) 881-4111 (facsimile) |
| ☐ mailed<br>☐ hand delivered<br>☑ CM/ECF Electronic Filing<br>☐ transmitted fax machine<br>    to: | Wm. Breck Seiniger, Jr., Esq.<br>SEINIGER LAW OFFICES, P.A.<br>942 W. Myrtle Street<br>Boise, Idaho  83702<br>(208) 345-4700 (facsimile) |
| ☐ mailed<br>☐ hand delivered<br>☑ CM/ECF Electronic Filing<br>☐ transmitted fax machine<br>    to: | Alan G. Burrow, Esq.<br>Assistant United States Attorney<br>U.S. Attorney's Office  --  District of Idaho<br>800 Park Blvd.<br>Sixth Floor<br>Boise, Idaho  83712<br>(208) 334-9375 (facsimile) |

JOHNSON & MONTELEONE, L.L.P.

Jason R.N. Monteleone
Attorneys for Plaintiff

PLAINTIFF/RELATOR'S MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT  --  33